Larry **WILLIAMS, et al.,**
**Plaintiffs-Appellants,**

v.

The **CITY OF NEW ORLEANS, etc., et al., Defendants-Appellees.**

No. 82–3435.

United States Court of Appeals,
Fifth Circuit.

April 23, 1984.

37.  *See supra* note 29.

O. Peter Sherwood, New York City, Ronald L. Wilson, New Orleans, La., for Williams.

Gilbert R. Buras, City Atty., Galen Brown, Asst. City Atty., New Orleans, La., for City of New Orleans.

Ralph D. Dwyer, Jr., New Orleans, La., for Civil Service Commission.

Elliott C. Lichtman, Donna R. Lenhoff, Women's Legal Defense Fund, Washington, D.C., for amicus Equal Rights Advocates, et al.

Frank W. Jackson, Supervising Asst. Corp. Cnsl., City of Detroit, Detroit, Mich., for amicus City of Detroit.

Leroy D. Clark, Center for National Policy Review, Catholic University School of Law, Washington, D.C., for amicus Center for National Policy Review & Wm. O. Douglas Inquiry.

Jeffrey C. Martin, Richard M. Sharp, Richard Talbot Seymour, Lawyers' Committee for Civil Rights, Washington, D.C., for amicus Lawyers' Committee for Civil Rights.

Herman Schwartz, American University, Washington, D.C., for amicus-Douglas Inquiry.

Kenneth E. Wile, New York City, for amicus Mexican American & Puerto Rican Legal Defense.

Samuel Rabinove, New York City, for amicus-Am. Jewish Committee.

Robert E. Williams, Washington, D.C., for amicus-Equal Emp. Advisory Council.

Dale C. Wilks, argued, New Orleans, La., for intervenors-Perez, Etc.

Sidney Bach, New Orleans, La., for Venezia, et al.

Lynne W. Wasserman, New Orleans, La., for Cindy Duke, et al.

William Bradford Reynolds, argued, Charles J. Cooper, Mark Disler, U.S. Dept. of Justice Civil Rights Div., Washington, D.C., for U.S.A.

Ralph S. Whalen, New Orleans, La., for Lombas, et al.

Before CLARK, Chief Judge, BROWN, WISDOM, GEE, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY and HIGGINBOTHAM, Circuit Judges [*].

JERRE S. WILLIAMS, Circuit Judge:

The disposition of this appeal is grounded in the amount of discretion properly given a district court in its decision to enter or disallow a proposed consent decree in a Title VII discrimination suit. We hold that the district court did not abuse its discretion by refusing to approve the proposed consent decree, and we affirm the holding of the district court.

The plaintiffs are a class of black applicants for positions with and members of the New Orleans Police Department. The suit is brought against the City of New Orleans, the Civil Service Commission and individual officials, claiming racial discrimination under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The class complained of discriminatory policies in the selection, training and promotion of city police officers.

On October 13, 1981, the day the trial was scheduled to begin, the parties announced that they had settled the case and submitted their proposed consent decree to the district court for its approval. The 33-page proposed decree governed "virtually every phase of an officer's employment by the New Orleans Police Department"

---

[*] Judge Rubin and Judge Davis did not participate in the consideration or decision of this case.

(NOPD). 543 F.Supp. 662, 668. (E.D.La. 1982). The decree provided for significant changes in the NOPD's recruiting, hiring, training, testing and promotion standards and procedures.

Under the settlement defendants were required to send black officers on recruiting missions to black neighborhoods and schools. Black applicants would then be assigned "buddies" to guide them through the application process. The defendants agreed to shorten the application process itself and expeditiously address any problems associated with the process. New entry level procedures would be adopted under the settlement to assure that the proportion of blacks who graduated from the police academy was no lower than the proportion of blacks who passed the entry level examination. Training sessions were planned to help applicants prepare for the Police Recruit examinations, and black as well as white tutors and instructors would be made available for consultation. The proposed decree eliminated the use of general intelligence tests. In addition, it required the City to create an "Academy Review Panel", half of the members to be composed of black officers, to review any decision to dismiss a recruit. Any officer who was the subject of repeated citizen complaints could not serve as a police instructor.

The portion of the settlement here in issue has to do with officer promotions under the proposed decree. The City agreed to adopt procedures so that the proportion of whites appointed to each subclassification of officers would not exceed the proportion of whites actually eligible for that position. The City agreed to create 44 new supervisory positions immediately and fill all 44 positions with black officers. After this, whenever a supervisory position became available, the settlement provided that one black officer be promoted for every white until blacks constituted 50% of all ranks within the NOPD.

The settlement streamlined the requirements to be fulfilled before applying for a supervisory position, and implemented new, non-discriminatory selection criteria. Further, if a black officer failed to complete the probationary period pursuant to promotion, the settlement required that the vacancy be filled by another black officer. Content-valid tests were mandated and any use of a test item with a "statistically significant adverse impact against blacks" was disallowed.

Finally, the proposed decree provided for a $300,000 backpay fund to the plaintiff class, awarded costs and attorneys' fees to the plaintiffs, and imposed extensive reporting obligations on the defendants.

When the consent decree was submitted, objections were filed by classes of female officers, Hispanic officers, and white officers, who were granted leave to intervene for the limited purpose of challenging the decree.[1] Objections were also filed by eighteen members of the black plaintiff class.

After a four-day fairness hearing, during which the district court heard testimony from individual class members, intervenors and experts, the district court decided to withhold approval of the consent decree. While indicating approval of every other provision of the decree, Judge Sear concluded that the provision requiring black and white officers to be promoted on a one-to-one ratio until blacks constituted 50% of all ranks within the NOPD exceeded the court's remedial objectives and seriously jeopardized the career interests of non-black officers. Thus, the court did not approve the decree but encouraged the parties to modify the decree in a manner consistent with its opinion and resubmit it for approval. Plaintiffs appealed this decision,[2] and a panel of this court by a divided vote concluded that the district court had abused its discretion in conditioning its approval of the proposed consent decree on

---

1. These objecting officers constituted approximately three-fourths of the New Orleans police officers.

2. The denial of approval of a proposed consent decree has been held to be an appealable order. *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 998 and n. 14, 67 L.Ed.2d 59 (1981).

deletion of the promotion quota. The panel remanded the case with directions for Judge Sear to sign the decree. *Williams v. City of New Orleans,* 694 F.2d 987 (5th Cir.1982).

The United States subsequently sought and was granted permission to intervene and file a suggestion of rehearing *en banc.* On February 14, 1983, we granted the petition for an en banc rehearing, 694 F.2d 987, 988.

### I. Per Se Attack

■ We first respond to the intervenor-government's argument that affirmative action remedies, such as the disputed provision in this case, are never permissible under Title VII. The plaintiffs object to the trial court's failure to impose a firm quota system on the police department to remedy past violations of Title VII. In marked contrast, the government argues that the district judge had no power at all to order the NOPD to employ any kind of quota system to remedy past discrimination. According to the government's argument, the last sentence in § 706(g) of Title VII proscribes the use of any remedy which is not limited to actual victims of past discrimination.[3] Since the one-to-one quota system in the proposed consent decree was designed to benefit all blacks in the plaintiff class, and not just actual victims of discrimination, the government urges us to find that the quota provision violated Title VII.

We cannot accept this per se rule; the statute does not so require. As we said in *United States v. City of Miami,* 614 F.2d 1322, "at this point in the history of the

fight against discrimination, it cannot be seriously argued that there is any insurmountable barrier to the use of goals or quotas to eradicate the effects of past discrimination." 614 F.2d 1322, 1335 (5th Cir. 1980), *aff'd in part and in part vacated and remanded on other grounds,* 664 F.2d 435 (5th Cir.1981) (en banc).

This Court has long upheld the use of affirmative action in consent decrees under Title VII and has not required that relief be limited to actual victims of discrimination. *See Morrow v. Crisler,* 491 F.2d 1053 (5th Cir.) (en banc) *cert. denied,* 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974); *United States v. City of Alexandria,* 614 F.2d 1358 (5th Cir.1980). Further, the use of quotas or goals under Title VII without regard to specific victims as one means to remedy past discrimination has been upheld regularly throughout the federal courts of appeals. *See, e.g., Boston Chapter, NAACP, Inc. v. Beecher,* 504 F.2d 1017 (1st Cir.1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975); *Rios v. Enterprise Association Steamfitters Local 638,* 501 F.2d 622 (2d Cir.1974); *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 8, 39 L.Ed.2d 95 (1971); *Patterson v. American Tobacco Co.,* 535 F.2d 257, 273–74 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 315, 50 L.Ed.2d 286 (1976); *United States v. International Brotherhood of Electrical Workers, Local No. 38,* 428 F.2d 144 (6th Cir.), *cert. denied,* 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); *United*

---

**3.** Section 706(g) of Title VII, 42 U.S.C. § 2000c–5(g):

    If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date

more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 2000c–3(a) of this title.

States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); United States v. N.L. Industries, Inc., 479 F.2d 354 (8th Cir.1973); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971).

The Government only complains about the one-to-one promotion requirement in this case, but actually that was not the only provision in the proposed consent decree which afforded relief to individuals who had not actually suffered from the discriminatory policies of the NOPD. In fact, virtually all of the provisions were designed to benefit future applicants. In any event, the district court did not in its decision view as controlling the fact that the consent decree benefited non-victims. Nor do we. The question of whether affirmative action provisions are permissible as a general remedy under Title VII is not an issue in this case.[4] Instead, the issue in this case is the measure of discretion available to district judges in approval or disapproval of consent decrees. With regard to that narrow issue, we hold that the trial judge acted well within his discretion in affording the plaintiffs less than all the relief they had requested.

II. Standard of Appellate Review

In Title VII litigation, this Court has held that the district court is entitled to a substantial measure of discretion in dealing with consent decrees, and that as a result, "on appeal, our duty is to ascertain whether or not the trial judge clearly abused his discretion ..."[5] Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977). See also United States v. Allegheny-Ludlum In-

dustries, 517 F.2d 826, 850 (5th Cir.), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1975). Despite our expressed preference for this standard of review, however, appellants in this case urge us instead to engage in a de novo review of the district court's decision. They base their contention on our decision in City of Alexandria, supra, 614 F.2d 1358, in which we did not use the abuse of discretion standard in reviewing a consent decree. The opinion in that case, however, makes clear that it was recognizing the circumstances of that case as creating an exception to the general rule of "abuse of discretion" review.

In City of Alexandria, the parties had reached an agreement early in the pretrial process. When the settlement was presented for approval, the trial court had not heard any evidence at all in the case. Thus, the Court had no special knowledge as to the evidence. It had made no credibility choices; it had not had the opportunity to weigh evidence thoroughly based upon a full presentation of the case. As we noted in City of Alexandria, then, "the degree of appellate scrutiny must depend on a variety of factors, such as the familiarity of the trial court with the lawsuit, the stage of the proceeding at which the settlement is approved, and the types of issues involved." 614 F.2d at 1361.

The present case presents contrasting circumstances surrounding the district court's consideration of the consent decree. In the present case the trial court was completely involved in the pretrial proceedings. There were numerous pretrial conferences. Further, the district court held a four-day evidentiary fairness hearing,

---

4. For a detailed legislative analysis regarding the scope of § 706(g) where the validity of that section was at issue, see EEOC v. AT & T, 556 F.2d 167, 175–7 (3d Cir.) cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1977). In that case, three labor unions opposed a consent decree which had been approved in the district court. They argued that under § 706(g) the affirmative action provisions in that decree were impermissible. The unions contended that § 706(g) proscribed remedies in favor of non-identifiable victims of past discrimination. The court rejected the argument.

5. This Court has also employed the abuse of discretion standard in review of other types of settlements. See, e.g., Young v. Katz, 447 F.2d 431 (5th Cir.1971) (settlement in shareholder class action); Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 568 (5th Cir.1960) (bankruptcy settlement); In Re Corrugated Container Antitrust Litigation, 659 F.2d 1322, 1325 (5th Cir.1981), cert. denied, 456 U.S. 999, 102 S.Ct. 2283, 2308, 73 L.Ed.2d 1294 (1982) (anti-trust settlement).

which included presentation of testimony from the parties, intervenors, and experts. In this case, therefore, we have consideration of a proposed consent decree after a thorough airing of the facts. We here recognize that a district court does play a significant role in exercising discretion when it is fully cognizant of the facts and circumstances surrounding the case.

The panel opinion in this case carefully considered the contention of appellants that this Court should subject the decision of the district court to de novo review. Although the panel divided on the merits, the panel was unanimous in concluding that the standard of review in a case where the district court has had the thorough opportunity to consider the contentions of all persons involved should be reviewed on the basis of whether the district court has abused its discretion in its decision. As the panel opinion said: "The circumstances particularly upon which we rely include the district court's consideration and careful weighing, after a substantial evidentiary showing and its prolonged familiarity with the circumstances of the case, of the interests of the plaintiff black officer class as opposed to those of the intervening white, female, and Hispanic officer classes." 694 F.2d at 992.

■ We conclude that under the circumstances of this case, as opposed to the exceptional circumstances of the *City of Alexandria* case, the district court's denial of the present proposed decree is to be reviewed under the abuse of discretion standard. And we make no distinction based upon whether the district court approved or refused to approve the proposed settlement.

### III. Trial Court Approval of Proposed Consent Decrees

· We have repeatedly stressed our preference for voluntary settlement of Title VII employment discrimination suits, where Congress has expressed its specific inten-

tion that settlements be encouraged. *See Dent v. St. Louis San Francisco Ry. Co.*, 406 F.2d 399, 402 (5th Cir.), *cert. denied*, 403 U.S. 912, 91 S.Ct. 2219, 29 L.Ed.2d 689 (1969). Further, as we noted in *City of Alexandria*, "[i]t can be said without fear of contradiction that, in practice, district courts have generally approved proposed settlements ..." 614 F.2d at 1361. While settlement is encouraged and such agreements are generally enforced, however, the district judge cannot summarily approve a Title VII settlement, but must make an independent decision in each case concerning the fairness of every provision in the decree.

In a Title VII consent decree case, we require the district court to become more involved in the settlement process than it would in an ordinary case. When presented with an ordinary settlement, the court will approve the agreement if it is "fair, adequate and reasonable." *Cotton v. Hinton, supra*, 559 F.2d at 1330. In a Title VII consent decree case, however, even though the decree is contractual in nature, "the court ... must not merely sign on the line provided by the parties." *City of Miami, supra*, 664 F.2d at 440. As Judge Rubin emphasized in *City of Miami*, since a consent decree reaches into the future and has continuing effect, the district court must take an active role in its implementation.[6] Even where all the parties agree to a consent decree, the court should

> examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of the record, whether established by evidence, affidavit or stipulation.

*Id.* at 441.

The district court properly goes through this examination even when the consent

---

**6.** Although founded upon agreement of the parties, a consent decree has the force of res judicata because it is a judgment. It can be enforced by judicial sanctions, including citation for contempt, if the decree is violated. A settlement is

simply an agreement between the parties and can only be enforced by a subsequent suit. *United States v. City of Miami*, 664 F.2d 435, 439–40 (5th Cir.1981) (en banc).

decree only affects the parties who drafted the decree. But where, as in this case, the decree has the potential to affect third parties, the court must make an additional finding. When third parties are involved, the court must also carefully scrutinize the decree with respect to their rights and conclude that the effect on the third parties is "neither unreasonable nor proscribed." *Ibid.*

In this particular case, the need for the district court to play an active role was even more essential than it was in *City of Miami* or *City of Alexandria*. In those cases, as in most discrimination consent decree cases, the United States Department of Justice instigated the lawsuit. As this Court remarked in *City of Miami*, the presence of the Justice Department in the suit allowed the Court "safely [to] assume that the interests of all affected had been considered," since the Government is responsible for representing "the interests of all citizens, white as well as black, males as well as females." *United States v. City of Miami, supra*, 614 F.2d at 1332, n. 18, *aff'd*, 664 F.2d 435 (1981) (en banc). In the present case, however, the litigation and settlement were instigated by a class of private plaintiffs which did not have any responsibility toward third parties who might be affected by their actions. The suit was pursued on behalf of blacks only, and the remedies contained in the consent decree were designed to benefit blacks only. Because of the absence of any governmental agency to protect nonrepresented groups subject to discrimination, such as Hispanics, women, and non-Hispanic whites, there was no adversarial constraint upon a possible tendency of affirmative action to go too far. Thus, the district court had to bear the full responsibility in this case to safeguard the interests of those individuals who were affected by the decree but were not represented in the negotiations. The thrust of the district court decision was rooted in this responsibility.

### IV. Discretion in Approval of the Particular Quota Provision

Although this Court has frequently approved preferential hiring ratios in the past, *see United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826 (5th Cir.1975); *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.1974); *United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980), their use is not mandated in every instance. Further, firm rules have not been established as to when quotas must be used. Instead, we have left the district courts with the responsible and difficult task of determining the outer boundaries of affirmative remedial relief. In contrast to the lack of authority describing when quotas must be used, the two leading Title VII quota cases—*United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); and *Fullilove v. Klutznick*, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) do provide guidance with respect to the analysis a district court should follow in making this decision.

*Weber* involved a voluntary collective bargaining agreement between the United Steelworkers of America and Kaiser Aluminum and Chemical Corporation. The agreement, which covered terms and conditions of employment at Kaiser plants, contained a numerical hiring goal equal to the percentage of blacks in the local labor forces. Under the plan, on-the-job-training programs were established to help plants meet the goal, and 50% of the openings in the training programs were reserved for blacks. Several white production workers, who were rejected from the training program because of the quota, instituted a Title VII class action and secured an injunction against the implementation of the program. The Supreme Court reversed the decision enjoining the program but specifically refused to "define in detail the demarcation between permissible and impermissible affirmative action plans." The court limited its holding to finding that the quota fell "on the permissible side of the line." 99 S.Ct. at 2730. Despite their reluctance to dictate the precise limits on affirmative relief, however, the Court in *Weber* did illuminate the field to a certain degree by disclosing the analysis it followed in reaching the decision to approve the quota in that case. Before issuing its

approval, the Court carefully reviewed the purpose and duration of the plan, as well as the plan's effect on third parties. The Court's opinion shows that there must be careful analysis of the context of each individual case before imposition of numerical relief. While the quota fell on the "permissible side of the line" on the facts in *Weber*, the holding in that case is far short of giving a carte blanche to all similar quota systems.

In *Fullilove v. Klutznick*, the Supreme Court again focused its attention on the need for careful analysis of all surrounding circumstances before implementation of numerical relief. In that case, the Court upheld the power of Congress to approve a provision of the Public Works Employment Act of 1977, which required that at least 10% of federal grants for local public works projects be used to procure services provided by minority groups. While the Court approved the quota, Justice Burger cautioned that "[a]ny preference based upon racial or ethnic criteria must necessarily receive a most searching examination." 100 S.Ct. at 2781.

Justice Powell agreed with this strict standard. In his concurring opinion he listed various factors that should be considered before entering a race-conscious remedy, and in defining the scope of such a remedy. Although this case involved Congressional approval rather than a judicial decree, Justice Powell relied on the factors traditionally used in judicial decisions regarding numerical relief. He noted that when faced with the option of numerical relief, courts have considered such factors as: the efficacy of alternate remedies; the planned duration of the remedy; the relationship between the percentage of minority workers to be employed and the percentage of minority group members in the relevant population or workforce; and the availability of waiver provisions. *Id.* at 2791. The Justice affirmatively rejected the suggestion that the burden placed on nonminorities was legally irrelevant to the decision whether to implement a numerical

quota. He emphasized that after consideration of all the other factors, "[a] race-conscious remedy should not be approved without consideration of an additional crucial factor—the effect of the set-aside upon innocent third parties." *Id.* at 2793.

Following the guidelines set out in these two cases, this Court has also adopted a cautious, methodical approach to the implementation of percentage goals. In *City of Alexandria, supra*, 614 F.2d 1358, for example, we used the guidelines to review the settlement between the United States Department of Justice and the City of Alexandria. The decree in that case provided affirmative hiring relief for women and blacks in the police and fire departments. Even though everyone involved agreed to the quota, we still assessed its purpose, duration and effect on third parties.[7]

In the present case, 75% of the members of the police department had filed objections to the terms of the decree. The court obviously was obligated to give careful consideration to the interests of all persons affected. The court properly followed the guidelines set out above, and evaluated the proposed elements of the settlement, giving a detailed review to every provision. After four days of hearings, the court concluded that with one exception, all of the affirmative action aspects of the settlement were valid. The court found only that the provision requiring a one-to-one promotion ratio was overbroad and unreasonable in the light of the severe and longlasting effect on the rights of women, Hispanics, and non-Hispanic whites. The record built in the district court enabled it to give full consideration to the relationship between the numerical targets specified in the proposed decree and the proportion of blacks in the relevant population, the extent to which third parties' rights were infringed, the duration of the remedy, the efficacy of the alternative measures, and the remedy's flexibility.

---

**7.** This examination is typically reserved for the district court, but as mentioned earlier, the district court in *City of Alexandria*, did not make this examination. Therefore, on appeal, we reviewed the propriety of the quota de novo, *see* p. 1558, *supra*.

The court first found that the quota's target of 50% blacks in all ranks was unsupported by the record. In reaching this conclusion, the district court relied on plaintiff's labor economist, Dr. Mark Bendick, who testified that even if hiring and promotions on the NOPD had been conducted free of racial considerations, by 1980 blacks would have only comprised 40.7% of all sergeants, 39.4% of all lieutenants, 37.4% of all captains, and 30% of all majors.

Furthermore, the district court found that even these estimates were overstated due to certain shortcomings in Dr. Bendick's analysis. First, in calculating these percentages, Dr. Bendick relied on applicant flow data, which indicates the racial breakdown of all applicants to the police department. While applicant flow data is a proper consideration in determining the relevant labor market, *Markey v. Tenneco Oil Co.*, 635 F.2d 497 (5th Cir.1981), this type data cannot always be taken at face value. *See Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir.1981) (applicant flow data invalid since discriminatory practices infected recruiting). Experts called by the Hispanic, non-Hispanic white, and female intervenors testified that in this case such data was statistically distorted because the NOPD had engaged in extensive black recruitment throughout the 1970's. As a result, the percentage of black applicants to the NOPD was deceptively inflated. Several NOPD officers and CSC employees testified about the existence of special recruiting efforts for blacks and this testimony was not refuted by the plaintiffs. The district court thus had a substantial basis for deciding that the analysis of the plaintiff's expert, which utilized applicant flow data, overstated the percentages of blacks in the relevant labor market.

The district court also felt Dr. Bendick's analysis was flawed in its choice of relevant labor market. Dr. Bendick confined his study to Orleans Parish, which is at present 55% black. The district court concluded that the true labor market extends past Orleans Parish to include the general Standard Metropolitan Statistical Area (SMSA), which contains a substantially lower percentage of blacks. This particular statistical finding by the district court is the cornerstone upon which appellants launch their attack. Appellants contend that the district court misinterpreted the statistics and relied on the wrong geographical pool. As a result, the appellants argue, the district court's finding against the 50% target quota was clearly erroneous. We must disagree. The district court reached its decision after hearing testimony from several witnesses. One expert[8] testified that a state statute (33:2411) and a city ordinance (No. 5240, MCS) require the City to hire city residents unless the NOPD's needs could not be fulfilled from this market. But, on the other hand, this witness also testified that even if applicants resided outside the City of New Orleans, they could still be hired if they agreed to move within Orleans Parish during their one-year probationary period. In some cases, even this requirement was waived. In addition, after questioning by the court, one of plaintiff's own witnesses[9] testified that the NOPD actively engaged in efforts to recruit officers from areas outside of Orleans Parish. There also was testimony to the contrary.

The power of the district court clearly includes the exercise of discretion in weighing testimony. The record amply supports the conclusion reached by the court. It was based upon the testimony of witnesses presented by both sides that the City recruited outside Orleans Parish. The court also relied on intervenor's expert witness, Dr. Morris, an industrial psychologist, who testified that based on the City's practices, the correct geographical area was the general SMSA and not just Orleans Parish.

In any case, the appellants place undue emphasis on this portion of the district court's reasoning. They have not shown that the district judge's decision to approve

---

8. Leroy Acouin, Chief Administrative Officer of the City of New Orleans.

9. Officer Arnesta Taylor, Jr., head of the recruiting and applicant investigation division for the New Orleans Police Department.

or disapprove this proposed consent decree should turn solely upon the exact percentages of minorities in the geographical pool. Even if Orleans Parish is, in fact, the proper geographical unit in this case and even if there is a 50% black hiring pool in the Parish (both assertions of which were heavily debated in the district court) the district court still had the discretion to disapprove the decree if it felt that, nevertheless, the provisions of the decree were "seriously jeopardizing the career interests of non-black officers." 543 F.Supp. at 686.

Geographical percentage comparisons are certainly relevant, *United Steelworkers of America v. Weber, supra,* 99 S.Ct. at 2730, and a quota that seeks to represent the same racial proportion among employees as exists in the actual labor force ordinarily is reasonable. But even though such a quota often is acceptable, this does not guarantee that the particular quota in this case is the appropriate or reasonable remedy. The validity of the quota is in doubt under this record.

This Court emphasized in *NAACP v. Allen,* 493 F.2d 614, that the Constitution only demands "equality of access." Quotas are only one means to strive to reach this result. 493 F.2d 614, 621 (5th Cir. 1974). Quotas are often preferred because they have proved to be a swift means of creating "an environment where merit can prevail." *Ibid.* Unfortunately, quota relief does not operate in a vacuum, and the most effective aspects of quotas for the target group create the most harmful results for others. For this reason, quota relief is sometimes viewed as "drastic," and we have warned that "traditional concepts of comity and judicial restraint must ... guide the discretion which chooses to use ... [this] remedy." *Ibid.* These general views concerning care in the use of quotas are reflected in the Supreme Court's 1980 decision in *Fullilove v. Klutznick* as discussed previously.

Independently of the decision regarding the proper geographical district, the district court also objected to the one-to-one hiring quota on the grounds that it would have an inordinately harsh impact on non-black officers, specifically the non-black officers who belonged to other minority groups. Of critical importance is the recognition that the court may properly take into account the possibility that a fixed quota may well deny the application of a standard requiring qualification for the positions. While this proposed consent decree states that no unqualified person need be hired or promoted, there can be a proper concern that the fixed 50% requirement in promotion could place undue pressure upon qualification requirement. "If a party is not qualified for a position in the first instance, affirmative action considerations do not come into play." *Bratton v. City of Detroit,* 704 F.2d 878, 892 (6th Cir.1983).

The court based its opinion on the fact that the quota would create separate promotional tracks for blacks and whites in the NOPD, forcing non-blacks to compete for fewer positions even though this group comprised a larger percentage of total officers in the force. The district court particularly emphasized the difficulty this presented to non-black minority officers. The quota assures for example, that representation of white and Hispanic females will continue to be disproportionate, since under the decree, women would be forced to compete against men for a reduced number of vacancies. This reasoning also applies to Hispanic men. Although they are adequately represented at this time, under the quota, continued representation would not be insured.

The decision of the panel in this case dismissed the female officers' complaints by simply noting that if the women felt that the decree damaged their promotional opportunities, they could pursue similar relief in an independent action. We recognize though that women have the same rights as others against discrimination under Title VII, and the trial court is responsible for protecting those rights. The women were intervenors. It would not be proper for the court to put its imprimatur upon a consent decree that violates those rights, or at the very minimum, it was properly within the court's discretion to refuse to do so. The purpose behind examining a proposed consent decree's effect on

third parties is to protect the rights of those parties as well and to eliminate the need for subsequent lawsuits.

Appellants dismiss the district court's concerns about the decree's discriminatory impact on third parties. They claim that by relying on such concerns in rejecting the decree, the district court abused its discretion. The appellants argue that since the racial disparity within the NOPD was due to the Department's own past discriminatory practices, preferential treatment of the victims of such discrimination is acceptable. The fact that preferential treatment is acceptable, however, is not the point in this case. The extent of preferential treatment is what is at issue. The great bulk of the proposed decree was approved by the court. It is full of provisions involving preferential treatment of blacks because of prior departmental racial discrimination.

The court also expressed concern about the decree's duration, estimated at no less than twelve years,[10] which would span almost the entire career of many non-black officers. The court noted that the careers of many of the officers, especially those recently hired, would be significantly hindered by the remedy even though those officers had never benefitted from the effect of past discrimination. Of course, the appellants are correct in asserting that it is permissible for an affirmative action plan to aid one minority at another group's expense. "When effectuating a limited, properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible." *Fullilove v. Klutznick, supra,* 1000 S.Ct. at 2778, *citing Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 1270, 47 L.Ed.2d 444 (1976).

Naturally, the burden of remedying past discrimination must be borne by someone. Nevertheless, when the district court is the process of tailoring the remedy, it is particularly appropriate for it to consider the long-term effect of the decree. The ideal goal in this type case is to provide a suitable remedy for the group who has suffered, but at the least expense to others. We emphasize that in holding that the district court did not abuse its discretion in this case, we do not modify our previously expressed view that temporary hiring goals are ordinarily reasonable. *City of Alexandria, supra,* 614 F.2d at 1366. This principle, which was drawn from the Supreme Court decision in *Weber, supra,* 99 S.Ct. at 2730, is still the standard on which district courts should base their analysis.

■ In this case, the district court did analyze the quota's duration with *Weber* in mind,[11] but concluded that on these facts the remedy in general was too disabling and that the decree's duration aggravated this effect. The district court did not hold that the quota was impermissible only because of its duration, but considered duration as a part of the totality of a proposal in which other defects also were found. We respect the district court's considered judgment. "Title VII implicitly recognizes that there may be cases calling for one remedy and not another, and—owing to the structure of the federal judiciary—these choices are, of course, left in the first instance to the district courts." *Franks v. Bowman Transportation Co., supra,* 96 S.Ct. at 1271 (1976), *citing Albermarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975). In the light of the district court's expressed concerns regarding the effect of this one particular quota, and in the light of its approv-

---

**10.** Although the court appointed expert estimated the goal could be achieved in twelve years, the district court felt that this was actually a doubtful projection. The pace of the decree would depend on the number of vacancies in each rank and the number of vacancies would depend on the number of retirements and other separations within each rank. Since the NOPD had recently implemented a policy discouraging early retirement, the court felt that the expert's turnover statistics might be somewhat high. Further, the court questioned the expert's assumption that 125 recruits would enter the force annually, when the average recruit class only numbered 90. All of these conclusions by the court were clearly within the scope of its discretion.

**11.** *See Williams, supra,* 543 F.Supp. at 679 for trial court's discussion of *Weber.*

al of specific and sweeping affirmative action favoring plaintiffs throughout the rest of the decree, we find that the district court has not abused its discretion in refusing to enforce the one-to-one promotional quota in the decree. On the contrary, the record shows a conscientious and well thought out effort by the district court to cooperate with the parties to this action in eliminating discrimination in the New Orleans Police Department while at the same time respecting valid concerns of the numerous intervening parties whose interests would also be affected by the decree. In affirming the district court we emphasize that the parties are not foreclosed from presenting other proposals both as to the particular issue or in modifying other portions of the proposal because of the refusal of the district court to accept the 50% promotion quota requirement.

AFFIRMED.

GEE, Circuit Judge, with whom GARWOOD, Circuit Judge, joins, specially concurring:

■ Judge Williams' thorough opinion establishes that the district judge did not abuse his discretion in refusing to approve one among many provisions of a consent decree designed to eradicate discrimination against black officers in the New Orleans Police Department—a one-for-one promotion quota of lengthy duration that is unsupported even by the evidence of the complainants' labor economist. *See* 729 F.2d at 1561–1562 (Williams' op.). My views are generally in accord with those expressed in the dissent of Judge Reavley from the panel opinion, to be found at 694 F.2d 987, 997–998. No more is required to affirm the district court's judgment, and I would write no more.

I cannot join in the opinion's general approbation of racial quotas for governmental entities. I do not believe that the Constitution authorizes the imposition of a decree that requires a unit of state government to discriminate on the basis of race without reference to whether those favored

have ever been the victims of discrimination or those injured have either practiced or benefited from it. Certainly I do not believe that any decision of the United States Supreme Court blesses such a measure. Writing for the Court in *Weber*,[1] Justice Brennan went out of his way, on at least eleven different occasions, to point out that what was there before the Court was *private* affirmative action. He also specifically stated that the Court in *Weber* was not concerned with "what a court might order to remedy a past proved violation of the Act"[2] (and I note that here there is no finding of past violation, merely a likelihood of a *prima facie* case).

Such quotas are desperate measures, inherently invidious as calculated denials of the rights of one citizen in order to enhance those of another—both done on the frank ground of race. If they are ever appropriate, in my view, that can only be as a last resort, when it is clear that nothing else will suffice. See *Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.1974). Their employment in casual social tinkering by the courts is dangerous and unwise; I would lend it no unnecessary credence. Since Judge Williams' opinion does so, I concur in the result only.

PATRICK E. HIGGINBOTHAM, Circuit Judge, with whom GARWOOD and JOLLY, Circuit Judges, join, specially concurring:

■ I concur in the result reached by Judge Williams, but do not agree that the difficult issues now before us can be avoided by deciding whether the district court abused its discretion. We cannot enjoy that comfort of non-decision. Discretion implies a choice of courses. The consent decree proposed illegal racial discrimination and the only permissible course was to refuse the proposed settlement.

I

Of course, our Constitution has as an objective a color-blind society, but its

---

1. *United Steelworkers of America v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979).

2. 443 U.S. at 200, 99 S.Ct. at 2725.

means include the Fourteenth and Fifteenth Amendments to the Constitution and each measures its proscriptions in part by considerations of race. Judge Wisdom is then indisputably correct in contending that in a normative sense, we are forever race bound. Racial discrimination is a specific failure to recognize the worth of the individual, a prime ideal of our constitutional structure. The vision, as I will argue, is that we are a nation of persons, not groups. Indeed, the Thirteenth, Fourteenth and Fifteenth Amendments are confessions of failures to value persons individually. But whatever the power of the Congress to allow courts to adopt remedial decrees in their explication, framed in group terms in response to proved group treatment, our first question is whether the Congress has done so.

## II

The legislative history of Title VII makes plain that, as Senator Humphrey put it:

[T]here is nothing in [the proposed Bill] that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial "quota" or to achieve a certain racial balance.... That bugaboo has been brought up a dozen times; but it is nonexistent.

110 Cong.Rec. 6549 (1964). *But see E.E. O.C. v. American Tel. & Tel. Co.*, 556 F.2d 167 (3d Cir.1977), *cert. denied* 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1979). The legislative history was summarized by Justice Rehnquist in *United Steelworkers of America v. Weber*, 443 U.S. 193, 219, 99 S.Ct. 2721, 2735, 61 L.Ed.2d 480 (1979) (Rehnquist, J., dissenting). While that dissent did not carry the Court in *Weber*, the majority walked past it in its emphasis that the sole question was whether Congress intended "an absolute prohibition against all private, voluntary, race-conscious affirmative action efforts to hasten the elimi-

nation of such vestiges." *Id.* at 204, 99 S.Ct. at 2727. In doing so the *Weber* majority conceded, as indeed it was forced to, that Title VII would not *require* "racially preferential integration efforts." *Id.* at 205–06, 99 S.Ct. at 2728. The Court emphasized that "[t]he Section does *not* state that 'nothing in Title VII shall be interpreted to *permit*' voluntary affirmative efforts to correct racial imbalances." *Id.* at 206, 99 S.Ct. at 2728 (emphasis in original). In sum, the *Weber* Court decided only "that Congress did not intend to limit traditional business freedom to such a degree as to prohibit all voluntary, race-conscious affirmative action." *Id.* at 207, 99 S.Ct. at 2729.

That the *Weber* Court to this extent left traditional management prerogatives open and allowed the free market in hiring to function does not answer our question. Our question is instead whether requiring the City of New Orleans to promote one black for every white, whether or not the favored black was ever a victim of discrimination, until a specific quota is achieved is a permissible judicially-imposed remedy. The legislative history of Title VII answers this question in clear terms. Such a practice cannot be required.[1]

It does not matter that the case was not tried to conclusion. If the class had proved its contention that the City had discriminated in its promotion practices, the permissible remedies would have included back-pay and rightful place for all class members denied promotions. Nothing in the history of Title VII, or otherwise, justifies the jump from such permissible relief to that of what can fairly be described as an obligation to proportionally employ. The remedy simply does not address the wrong.

Wrong and remedy are best wed by candidly surfacing the targeted wrong. A quota which injures persons not participating in accused segregation patterns to the

---

1. The argument that the Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, 86 Stat. 103 (1972) adopted judicial construction of the 1964 Act suffers in several respects. First, the judicial construction assertedly adopted was not so plain. Second, it is difficult to find that the Congress intended to impose on states and local government employers exposure to quotas which it rejected for private employers eight years earlier. Such a marked shift in congressional purpose would surely have been spoken, if intended.

benefit of persons who were not its victims is responsive to a wrong defined in terms of a failed social order—of a judicially envisioned distribution of jobs among races, ethnic groups and sexes. Such social ordering is a peculiar use of judicial power because use of judicial power to resolve disputes has traditionally and constitutionally been confined in the main to disputes whose dimensions are drawn by adverse parties.[2] Social ordering is a horse once mounted from which it is difficult to dismount because changes in the makeup of populations, overlaid by any job qualification deficits posed by changing industry in given areas, will confound efforts to conclude. Surely our difficulty in attempting to decide when a school district is "unitary" is instructive. Relatedly, cutting back the permissible size of classes under Fed.R. Civ.P. 23, while tolerating decrees that afford relief to persons who were not parties, to the injury of persons who were never wrongdoers, is paradoxical. *See General Telephone Company of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The point is not that courts ought to shrink from duty because its discharge is difficult or controversial. It is instead that the very uniqueness of

what we are doing ought to give pause over whether we have undertaken a legislative rather than a judicial role—also a question of constitutional magnitude.

In sum, the provision rejected by the district court does not respond to the claims of the class members. The committed wrong is not the failure of the employer to maintain a work force in proportion to some SMSA percentage. The illegality is in discriminating against black persons eligible for promotion. So defined, if after each class member was given his rightful place the resulting employee work force should remain less than the SMSA proportion, it is difficult to see how the remedy could be called inadequate.

### III

The sometimes inscrutable trilogy of *Regents of the University of Calif. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), and *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), at the least require that a state's use of race to correct a wrong be tailored to that wrong; that is, the plan

---

**2.** It is a classic "polycentric" dispute that sorely taxes the judicial role:

[S]uppose in a socialist regime it were decided to have all wages and prices set by courts which would proceed after the usual forms of adjudication. It is, I assume, obvious that here is a task that could not successfully be undertaken by the adjudicative method. The point that comes first to mind is that courts move too slowly to keep up with a rapidly changing economic scene. The more fundamental point is that the forms of adjudication cannot encompass and take into account the complex repercussions that may result from any change in prices or wages. A rise in the price of aluminum may affect in varying degrees the demand for, and therefore the proper price of, thirty kinds of steel, twenty kinds of plastics, an infinitude of woods, other metals, etc. Each of these separate effects may have its own complex repercussions in the economy. In such a case it is simply impossible to afford each affected party a meaningful participation through proofs and arguments. It is a matter of capital importance to note that it is not merely a question of the huge number of possibly affected parties, significant as that aspect of the thing

may be. A more fundamental point is that each of the various forms that award might take (say, a three-cent increase per pound, a four-cent increase, a five-cent increase, etc.) would have a different set of repercussions and might require in each instance a redefinition of the "parties affected."

We may visualize this kind of situation by thinking of a spider web. A pull on one strand will distribute tensions after a complicated pattern throughout the web as a whole. Doubling the original pull will, in all likelihood, not simply double each of the resulting tensions but will rather create a different complicated pattern of tensions. This would certainly occur, for example, if the doubled pull caused one or more of the weaker strands to snap. This is a "polycentric" situation because it is "many centered"—each crossing of strands is a distinct center for distributing tensions.

... Here, again, we are dealing with a situation of interacting points of influence and therefore with a polycentric problem beyond the proper limits of adjudication. Fuller, *The Forms and Limits of Adjudication,* 92 Harv.L. Rev. 353, 394–5; (1978).

must be a "limited and properly tailored remedy." 448 U.S. at 484, n. 72, 100 S.Ct. at 2777, at n. 12. Though *Bakke* establishes that "race may be taken into account as a factor" in the creation of a remedial plan to counteract previous discrimination, 438 U.S. at 296 n. 36, 99 S.Ct. at 2751 (opinion of Powell, J.), *id.* at 325, 98 S.Ct. at 2766 (opinion of Brennan, White, Marshall, and Blackmun, JJ.), *Fullilove* holds that, even when such a plan is adopted only after the most searching and thorough congressional inquiry, culminating in a legislative finding of past discrimination, it must still be subjected to "close examination" by the reviewing court. 448 U.S. at 472, 100 S.Ct. at 2771 (opinion of Burger, C.J.). Chief Justice Burger's plurality opinion in *Fullilove,* joined by Justices Powell and White, notes that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." *Id.* at 491, 100 S.Ct. at 2781. Justice Powell wrote a concurring opinion adhering to his endorsement in *Bakke* of a strict scrutiny standard of review for all racially-based plans. *Id.* at 495, 100 S.Ct. at 2783. Dissenting, Justice Stewart, joined by Justice Rehnquist, urged that "any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid." *Id.* at 523, 100 S.Ct. at 2797 (Stewart, J., dissenting).

From this multitude of opinions it appears that five Justices in *Fullilove* would subscribe to the proposition that "a most searching examination" is the *minimum* standard of scrutiny for a remedial plan that forthrightly employs race as an employment criterion. *Weber* adds no further insight into this question because the absence of any state action there pretermitted any review of the challenged plan for compliance with the dictates of the Fourteenth Amendment.

We need not, and therefore ought not, reach the question of whether quotas in public employment assertedly responsive to prior discrimination can constitutionally ever include non-victims. The proposed consent decree included numerous other remedial responses to the wrong, including affirmative recruitment of blacks and assistance to them during the recruitment process; scrutiny of all tests for adverse impact; better training of blacks, including tutors; the creation of an "Advisory Review Panel," half of whom must be black, to review all decisions whether to dismiss or "recycle" a recruit; the immediate promotion of 44 black officers to newly created positions with supervisory responsibility; a prohibition of layoffs of supervisors; and a $300,000 back-pay fund.

The only question we must address in this case is whether the quota is so necessary to the correction of past discriminatory employment practices within the New Orleans Police Department that its adverse impact on present and future non-black officers is justifiable as an unavoidable side-effect of the constitutionally-required remedial process—the unpleasant taste that accompanies necessary medicine. In making this assessment, we must consider the beneficial effect fairly to be expected when the other, unchallenged elements of this consent decree are implemented. It cannot plausibly be contended that a quota which advantages blacks who have not been victims of prior discriminatory practices at the expense of non-black officers who may not have perpetrated or benefited by those practices is the *sine qua non* of effective relief to bring this department into compliance with the commands of Title VII and the Fourteenth Amendment.

Black individuals have in the past contended against discriminatory employment practices, and it is the function of the courts to fashion appropriate relief for these individuals. The courts must in proper cases also take action necessary to abolish these practices so that additional black individuals will not confront them in the future. But when courts attempt to deal with entire races as though they were unified groups, we betray the dictate of the Fourteenth and Fifteenth Amendments that race alone should not be used to classify and delimit the individual members of any group. "The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individ-

ual. The rights established are personal rights.... Equal protection of the laws is not achieved through indiscriminate imposition of inequalities." *Shelley v. Kraemer*, 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948) (footnote omitted).

When we lose sight of the need to tie remedy to wrong, we confound the very principles we are striving to vindicate, because we impose burdens and confer benefits along racial lines with no assurance that we are thereby undoing the injustices of the past; rather, by regarding races— and not their individual members—as though they were parties before the court, we perpetuate new injustices in derogation of the right of those benefited and burdened alike to be treated as individuals. In addition, we thereby impair our own ability to express in coherent and cohesive fashion our commitment to the doctrines of individual worth central to our modern constitutional jurisprudence. "If it is the individual who is entitled to judicial protection against classifications based upon his racial or ethnic background because such distinctions impinge upon personal rights, rather than the individual only because of his membership in a particular group, then constitutional standards may be applied consistently." *Bakke*, 438 U.S. at 299, 98 S.Ct. at 2752 (opinion of Powell, J.).

The principal failing of the proposed quota is that it regards all members of the black race as a single class, rather than recognizing that the group is composed of individuals, some of whom have suffered the invidious effects of past discrimination and some of whom have not. I have no objection, of course, to grouping those individuals who have suffered some wrong and

now prosecute their case on a group basis; this is the traditional application of the class relief doctrine embodied in Fed.R. Civ.P. 23 and ultimately specific affirmative relief will focus on individual class members. What I cannot accept is the notion that "the black race" is an independent legal entity and that relief for past discrimination against black persons should take the form of special advantages granted in the future to "the black race." Races, *per se*, are not proper parties to a court action.

A substantial consideration impelling the Supreme Court to uphold the racially nonneutral contracting scheme challenged in *Fullilove* was the presence in the legislative scheme of administrative safeguards designed to minimize the imposition of benefits and burdens not justifiable as remedies for past discrimination. 448 U.S. at 486–89, 100 S.Ct. at 2778–2780 (opinion of Burger, C.J.). Here, by contrast, the proposed promoting quota made no effort to correlate prior victim status to future advantage; to be black *ipso facto* would be to benefit under this plan.

But, the class[3] replies, and Judge Wisdom writes, school desegregation cases have not infrequently employed group remedial devices. Judge Wisdom's assertion can hardly be denied. Under our school desegregation jurisprudence, the school districts are either within or without a state of legal grace, termed unitary. By definition, every child in such system is a specific victim of any illegality. Such group remedies never involve the use of quotas in the sense that sole entitlement to relief is a matter of race independent of whether the person was a victim.[4]

---

**3.** The class was virtually abandoned in the bargained for quota, with no hint as to why. The certified class included only victims:

   1. All black persons who have applied for but were denied employment as patrolmen in the New Orleans Police Department.

   2. All black persons who are presently police officers or were formerly police officers, who have been subject to racially discriminatory practices in assignments, promotions, discipline and general treatment by their supervisors and other employees.

**4.** We are learning that much of our school litigation has proceeded with ill-defined and largely ignored classes of litigants. Indeed, in some cases we learn after as long as ten years that no class of plaintiffs was ever certified and the originally proffered class representatives, and sometimes their counsel, have long since departed. Attempting to terminate such cases highlights their estrangement from classic party-oriented disputes. Our rules contemplate that a suit has parties. The history of school desegregation in Caddo Parish, Louisiana is illustrative. *See Jones v. Caddo Parish School Board*, 417 F.2d 801 (5th Cir.), *cert. denied*, 396 U.S. 904, 90

The district court confronted a proposed consent decree, many elements of which are unchallenged and are presumably desirable means of countering the effects of past discrimination. With their presence, whatever be the case if viewed in isolation, the quota was unlawful and inartfully drawn; it was drawn with no effort first to remedy the injury suffered by class members. In sum, this awkward and cumbersome proposed remedy cannot withstand the "searching examination" that it must, at the least, encounter when presented for judicial review. The court's decision to refuse to approve the decree was proper.

## IV

There is nothing in the refusal to allow quota promotions which impedes settlement of Title VII class suits. Had this decree articulated a reasonable mechanism for the identification of putative victims and called for their promotion in an immediate way or over a period of time, it would have been unassailable. The end result might well have been a requirement that the City would have had to promote more black persons than white persons, but that similarity in result masks a fundamental difference in the use of race in a remedial scheme. That difference is defined by the party oriented character of our judiciary and was drawn by the Congress in a compromise which allowed passage of Title VII.

> No court order can require hiring, reinstatement, admission to membership, or payment of back-pay for anyone who was not fired, refused employment or advancement or admission to a union by an act of discrimination forbidden by this Title.

H.R.Rep. No. 914, 88th Cong., 2d Sess 62, *reprinted in* 1964 U.S.Code Cong. & Ad. News 2391.

## V

The issues before us today are extraordinarily difficult. They present the seemingly insoluble "social conundrum of nourishing ethnicity in an effort to starve it." *See Vuyanich v. Republic National Bank of Dallas*, 505 F.Supp. 224, 394 (N.D.Tex. 1980), *rev'd*, 723 F.2d 1195 (5th Cir.1984). Nevertheless, these issues do not defy rational exposition.

Though I ultimately agree with the result reached by Judge Williams, I cannot accept his suggestion that the proposed hiring quota would have been constitutional and would have been permitted by Title VII had it been approved by the district court. This same objection prevents me from joining Judge Wisdom's scholarly and masterful dissent. While my views are set forth in greater detail they parallel those expressed by Judge Gee. For these reasons I join in the decision to affirm the rejection by the district court of the proposed consent decree and return the case for trial.

WISDOM, Circuit Judge, with whom BROWN, POLITZ, RANDALL, TATE and JOHNSON, Circuit Judges, join, concurring in part and dissenting in part:

This case involves a proposed consent decree providing for institutional, color-conscious, affirmative action to undo the effects of generations of past discrimination against blacks as a group in the New Orleans Police Department.

■ I concur in the holding expressed in Judge Williams' opinion for the Court that Title VII does not bar affirmative action and does not limit permissible remedies to actual victims of past discrimination. In *United Steelworkers of America v. Weber*, 1979, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, the United States Supreme Court conclusively determined that Title VII does not prohibit race-conscious affirmative action plans. *Id.* at 201–03, 99 S.Ct. at 2726–27. *Weber* involved private affirmative action, but the issue here is the same as the issue in *Weber:* Is it consistent with Title VII for an employer voluntarily to adopt prospective race-conscious goals to

S.Ct. 218, 24 L.Ed.2d 180 (1969); 421 F.2d 313 (5th Cir.1970); 499 F.2d 914 (5th Cir.1974); 704 F.2d 206 (5th Cir.1983), *reh'g en banc granted* 718 F.2d 120 (5th Cir.1983) (case has proceeded for nearly twenty years with no certified class and its dismissal is now being challenged, in part, for lack of proper notice).

remedy past exclusion of blacks from the workplace?[1] One thing *Weber* did make clear: To undo the effects of historical race discrimination by an employer, there need not be a showing of identifiable victims. This Court reached the same conclusion a decade earlier. *See Local 53, Asbestos Workers v. Vogler,* 5 Cir.1969, 407 F.2d 1047. We have never departed from our interpretation of Title VII that Congress intended that affirmative action be taken to remove the vestiges of racial discrimination. *United States v. City of Miami,* 5 Cir.1980, 614 F.2d 1322, *aff'd in part and in part vacated and remanded on other grounds (en banc),* 5 Cir.1981, 664 F.2d 435. A principal purpose for the passage of Title VII was to induce voluntary solutions, including race-conscious remedies, to end racial discrimination in the workplace.[2] *Weber,* 443 U.S. at 202, 99 S.Ct. at 2726;

*Detroit Police Officers v. Young,* 6 Cir. 1979, 608 F.2d 671, 690, *cert. denied,* 1981, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951. Any position that would prohibit such action is anomalous and must be rejected.[3]

At this late date in the development of remedial relief for longstanding race discrimination, the government intervenors and my esteemed brothers Gee and Higginbotham contest the authority of this Court to order prospective affirmative race-conscious remedies. Judge Gee questions the existence of constitutional authority to order prospective affirmative action by "a unit of state government" that benefits a class or group "without reference to whether those favored have ever been the victims of discrimination or those injured have either practiced or benefitted from it".[1] Judge Higginbotham expands Judge Gee's exposition of this argument and also

---

1. The Equal Employment Advisory Council, an association organized to promote (among other interests) the interest of employers, filed a brief as amicus curiae. The brief argues that this "Court should reaffirm that employers who voluntarily enter or have entered into agreements that are consistent with the standards set out by the Supreme Court in *Weber* ... remain free to use such agreements as a defense to 'reverse discrimination' suits." The general counsel for the Equal Employment Opportunity Commission (EEOC) submitted a brief to the Justice Department that adopted a similar position, stating that "a court's remedial authority under Title VII is not limited solely to making whole individual victims of discrimination, and properly may encompass relief in the form of race-conscious goals for the hiring and promotion of minorities." Although the EEOC did not submit the brief to this Court, its contents were incorporated by reference in an amicus curiae brief. *See infra* note 5.

2. Judge J. Skelly Wright, discussing the Civil Rights Act of 1964, stated that
   "The purpose of the legislation cannot be denied: to help blacks and members of other minority groups overcome the prejudice that oppresses them. Its effect is to give special advantage to those minority groups. To call such legislation 'color-blind' is a meaningless abstraction. Legislation against invidious discrimination helps one race and not the other because one race and not the other needs such help."
   Wright, *Color-Blind Theories and Color-Conscious Remedies,* 47 U.Chi.L.Rev. 213, 220–21 (1980).

3. *See* O. Fiss, *The Civil Rights Injunction* (1978), stating that
   "The beneficiary of the typical civil rights injunction is not an individual, or even a collection of identifiable individuals; rather it is a social group—the blacks. The contours of the benefitted group are determined not by the personal characteristics of the person who happens to be the named plaintiff but rather by considerations of who should—as a matter of fairness, efficacy, and equal protection theory—receive the benefit.... [T]his is due ... to the group character of the underlying substantive claim."
   *Id.* at 14–15.

4. It is clear that Title VII does not prohibit affirmative action by governmental employers. This Court has upheld affirmative action plans by governmental employers. *United States v. City of Alexandria,* 5 Cir.1980, 614 F.2d 1358; *United States v. City of Miami,* 5 Cir.1980, 614 F.2d 1322. In *Bratton v. City of Detroit,* 8 Cir. 1983, 704 F.2d 878, 884, *cert. denied,* — U.S. ——, 104 S.Ct. 1431, 79 L.Ed.2d 754, the Court noted that "Title VII was specifically amended to include public employees within its purview so that states and their official agencies are explicitly subject to Title VII mandates". *See* The Equal Employment Act of 1972, § 2(1), (5), Pub.L. No. 92–261, 86 Stat. 103. The City of Detroit's Police Department used a 50–50 ratio and the establishment of a 50 percent end goal to be achieved by 1990. In *Weber* Justice Brennan emphasized the private nature of the affirmative action only to make clear that there was no state action issue in the case.

**1572**

adds a contention based on the legislative history of Title VII.[5] The government intervenors contend that this Court's power to order affirmative relief is limited by the fourteenth amendment to those measures that are necessary to make whole the actual, identifiable victims of unlawful discrimination. The government intervenors maintain that the challenged one-for-one promotion plan is constitutionally infirm for two reasons. First, the proposed consent decree makes no provision for identifying the actual victims of unlawful discrimination or for limiting relief to those victims.[6] Second, the one-for-one ratio allegedly does not serve a compelling state interest.

Judge Williams' opinion for the Court does not reach the constitutional issues. I do. The Constitution *is* race-conscious. Under the thirteenth amendment, the Constitution contemplates, and the equal protection clause of the fourteenth amendment

5. Judge Higginbotham contends that the legislative history of Title VII "makes plain that as Senator Humphrey put it: [T]here is nothing in [the proposed Bill] that will give any power to the Commission or to any court to require hiring, firing, or promotion of employees in order to meet a racial 'quota' or to achieve a certain racial balance". The answer to his argument is made in the brief prepared by the EEOC, but filed in its entirety as an appendix to the brief of two amici curiae, The Center for National Policy Review and the William O. Douglas Institute into the State of Individual Freedom. I adopt the reasoning, authorities, and language of that brief as a short answer, in this opinion, to Judge Higginbotham's and the Department of Justice's arguments on legislative history.

Under Reorganization Plan No. 1 of 1978, 3 C.F.R. 321 (1970), *reprinted* in 5 U.S.C.A. App. at 150 (West Supp.1979), *and in* 92 Stat. 3781 (1978) and Executive Order No. 12067, 3 C.F.R. 206 (1978), all federal agencies are required to coordinate their interpretations of Title VII with the EEOC, the primary agency in settling interagency disputes relating to Title VII. The EEOC prepared a careful brief to be filed in this case supporting the proposed consent decree. According to the press, "The White House and Justice Department, attempting to squelch a major internal dispute over civil rights policy, have pressured the Equal Employment Opportunitite (sic) Commission successfully to withdraw an Appeals Court brief that sharply criticized Administration stands on racial quotas and affirmative action ... and said Justice's position had no legal merit and was a threat to efforts to eradicate employment discrimination." *Administration Prods EEOC on Quotas Brief,* Washington Post, p. A1 (April 7, 1983). Details of this episode appear in the BNA Daily Labor Report, *"EEOC Bows to White House Pressure, Says It Won't File New Orleans Brief,* 1983 DLR 67: A6 (April 6, 1983). See also, *Pressure Seen in Vote to Withdraw Brief on Quotas,* N.Y. Times, p. D15 (April 8, 1983); *EEOC Reverses Stand on New Orleans Suite Due to Pressure From Justice Department,* Wall St.J., p. 16 (April 7, 1983).

The brief carefully examined the legislative history of Title VII and all of the relevant decisions touching upon the origin and meaning of that title. The EEOC concluded that:

"[1] [T]here simply is nothing in the language of Section 706(g) or its legislative history to indicate that Congress intended to preclude courts from approving prospective race-conscious relief simply because the benefits of such relief are not restricted to actual victims of past discrimination.

.     .     .     .     .

[2] [T]here simply is not a sufficient basis either in fact or law for the Department of Justice's suggestion that prospective race-conscious employment goals are absolutely prohibited by the equal protection component of the Fifth Amendment."

The only decision directly in point agrees with the EEOC's conclusions. *EEOC v. American Tel. & Tel. Co.,* 3rd Cir.1977, 556 F.2d 167, *cert. denied,* 1979, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161.

6. Ignoring the legal issues for the moment, there are practical problems with the "identifiable victims" approach advocated by the government in this case. The government intervenors ignore the evidentiary problem of identifying the individual victims. Some blacks would not have applied for a position with the New Orleans Police Department because of their slim chance of being accepted, or if accepted, of their slimmer chance of being promoted. A police department that is perceived as anti-black in hiring and in promoting inhibits applications from blacks who are deterred from applying by the department's discriminatory practices. It would be impossible to identify these individual victims.

In addition, restricting relief to identifiable victims would impede voluntary settlement of Title VII suits. A consent decree is not an appropriate vehicle to identify actual victims. Every Title VII suit would require a phase II judicial proceeding to determine which individuals would be entitled to relief. This approach would contravene the clear intent of Congress to favor voluntary settlement and would place additional strain on the already-strained dockets of the district courts.

does not prohibit, race-conscious, class-based, prospective relief in a unit of state government in the appropriate case. The appropriate case is one in which discrimination in a state governmental unit is system-wide, institutional, and the product of a long history of discrimination against blacks as a group to continue what amounts to a caste system.[7] I would hold that the requested relief is within the district court's power to grant. I respectfully dissent from the part of the Court's opinion holding that the district judge did not abuse his discretion in rejecting the proposed consent decree.

## I.

Color-blindness is not constitutional dogma.[8] When a vice is inherent in a system, the vice can be eradicated only by restructuring the system. This was preeminently true of the public school systems in the South. The principle of institutional relief is also applicable in apportionment cases, eighth amendment prison condition cases, mental hospital cases, and other cases.[9] It is especially applicable in many state, county, and municipal departments in which his-

torically there has been discrimination not against an individual black as an individual but against blacks as blacks. Thus, when faced with our society's systemic racial discrimination against blacks as a class, an effective remedy must be color conscious. Writing separately in *University of California Regents v. Bakke*, 1978, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, Justice Blackmun stated:

> "In order to get beyond racism, we must first take account of race .... [a]nd in order to treat some persons equally, we must treat them differently. We cannot ... let the Equal Protection Clause perpetrate racial supremacy."

*Id.* at 407, 98 S.Ct. at 2807. The Constitution calls for equal treatment under the law, and in the light of the pervasive past discriminatory practices and the present effects of these practices, in many cases this goal can be achieved only by taking active, affirmative steps to remove the effects of prior inequality.[10] Neither ordering affirmative action by the courts nor permitting such action by employers in the area of employment discrimination breaks new legal ground.[11]

---

7. *See* Dimond, *The Anti-Caste Principle Toward a Constitutional Standard for Review of Race Cases*, 30 Wayne L.Rev. 1 (1983):

    "[Both liberals and conservatives] depict the primary wrong of official racial discrimination ... as a failure to treat black people as individuals without regard to race.... This understanding of personal rights and the individual wrong of racial discrimination ignores a fundamental problem: the potential group nature of the injury. Longstanding caste discrimination can build bias into a society's institutions and impose general harm on most members of the disadvantaged racial group.... The wrongdoing extends beyond the specific discriminatory acts of particular public officials, and the harm is not limited to particular persons directly affected by those acts...."

    *Id.* at 1–2 (footnotes omitted).

8. *See University of California Regents v. Bakke*, 1978, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (opinion of Brennan, J., joined by White, Blackmun, and Marshall, JJ.), stating that "no decision of this Court has ever adopted the proposition that the Constitution must be color-blind". *Id.* at 336, 98 S.Ct. at 2771. *See also United States v. Jefferson County Bd. of Educ.*, 5 Cir. 1966, 372 F.2d 836, *aff'd en banc*, 1967, 380 F.2d

385, *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, stating that

> "The Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination."

372 F.2d at 876.

9. *See* Fletcher, *The Discretionary Constitution: Institutional Remedies and Judicial Legitimacy*, 91 Yale L.J. 635 (1982).

10. *See* Wright, *Color-Blind Theories and Color-Conscious Remedies*, 47 U.Chi.L.Rev. 213 (1980). The prospective removal of racial barriers and the remedying of the present effects of these barriers through affirmative action and promotional goals in the workplace are necessary steps. *See also Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, finding that affirmative plans are constitutionally required to eliminate state-imposed segregation.

11. "We are not Johnny-come-latelys in the eradication of racial discrimination through race

**1574**

That affirmative action is permissible and, in some cases, required does not mean that such remedies escape scrutiny by the courts. The government intervenors in this case urge that "strict scrutiny" of all racial classifications is required by Supreme Court precedent. Their position is unsound, at least in Title VII cases. This Court has rejected the use of the strict-scrutiny standard in the context of affirmative actions plans embodied in Title VII consent decrees. *United States v. City of Miami*, 5 Cir.1980, 614 F.2d 1322, 1337-38, *aff'd in part and in part vacated and remanded on other grounds (en banc)*, 1981, 664 F.2d 435. Under the standard adopted in *City of Miami*, an affirmative action plan must meet two requirements: It must be reasonably necessary to remedy the discriminatory practice, and it must be substantially related to the goal of ending a pattern of discrimination. 614 F.2d at 1339. The record in this case reveals a gross statistical disparity between the percentage of blacks in all ranks of the police force and the percentage of blacks in the community and in the work force. On the record, as I read it, I would find that the challenged one-to-one promotional plan aimed at removing this disparity is both reasonably necessary to eliminate the effects of past discrimination and substantially related to the important governmental interest in removing racial barriers in employment. The plan passes constitutional muster based on the standard of review adopted by this Court in *City of Miami*.

Nor am I inclined to retreat from the position taken by the Court in *City of Miami*. A strict-scrutiny standard of review is not constitutionally required in so-called "benign" discrimination,[12] or affirmative action, cases. Strict scrutiny is required when the group that suffers harm because of the classification possesses the "traditional indicia of suspectness", that is, when the target class historically has been subjected to disabilities or singled out for unequal treatment by the majority. *University of California Regents v. Bakke*, 438 U.S. at 356 (opinion of Brennan, J.). Classifications that harm an oppressed group are likely to be the result of invidious discrimination or prejudice. Such classifications stigmatize the group and warrant the protections afforded by strict scrutiny. *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. Conversely, strict scrutiny is not required when the majority favors a minority at the majority's own expense; in such cases, the risk of invidious discrimination is diminished. *See* Ely, *The Constitutionality of Reverse Racial Discrimination*, 41 U.Chi.L. Rev. 723, 727-35 (1974). Because affirmative action plans fall into the latter category, strict scrutiny is not required; an intermediate level of scrutiny is sufficient to meet constitutional requirements.

Even accepting the government intervenors' position, however, and assuming that the Constitution requires strict scrutiny of all classifications based on race, I would conclude that a properly formulated affirmative action plan[13] aimed at achieving ra-

conscious means." *Morrow v. Crisler*, 5 Cir. 1974 (en banc), 491 F.2d 1053, 1057 (Brown, J., concurring). For a detailed discussion of affirmative action in this circuit, see F. Read & L. McGough, *Let Them Be Judged: The Judicial Integration of the Deep South* (1978), and J. Wilkinson, *From Brown to Bakke* (1979), especially chapter 5. The Supreme Court has expressly upheld affirmative, race-conscious relief in voting rights cases and in school desegregation cases. *See, e.g., United Jewish Organizations v. Carey*, 1977, 450 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229, stating that "the Constitution does not prevent a state ... from deliberately creating or preserving black majorities", *Id.* at 161, 97 S.Ct. at 1007, and *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554, stating that "affirma-

tive plans are required to eliminate state-imposed segregation." *Id.* at 12, 91 S.Ct. at 1274.

**12.** *See United Jewish Organizations v. Carey*, 1977, 430 U.S. 144, 169, 97 S.Ct. 996, 51 L.Ed.2d 229, 248 (Brennan, J., concurring), characterizing plans that use race in a purposeful manner as "benign" when they contain no racial slur or stigma.

**13.** A properly formulated plan is one that advances the purposes of Title VII, that does not "unnecessarily trammel" the interests of other employees, and that does not create an absolute bar to advancement by non-minority employees. *United Steelworkers of Am. v. Weber*, 443 U.S. at 208, 99 S.Ct. at 2729.

cial equality of employment in a police or fire department survives strict scrutiny. Under a strict-scrutiny standard of review, a classification must serve a compelling governmental interest and must be closely tailored to that purpose. A plan such as the one challenged in this case serves at least two such interests, both of which promote domestic tranquility within the state. First, the state has a compelling interest in curing the effects of past racial discrimination in the workplace and in ensuring an integrated work force. Kurst & Horowitz, *Affirmative Action and Equal Protection*, 60 Va.L.Rev. 955, 965 (1974). This interest focuses on group representation in employment and is distinct from that focused on the individual's right to be free from discrimination. *EEOC v. AT & T Co.*, 3 Cir.1977, 556 F.2d 167, 179–80, *cert. denied*, 1978, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161. Thus, the state's interest cannot be served adequately by a remedy that addresses only the rights of identifiable victims.

Second, as is urged in this case by the City of Detroit (amicus curiae) and as has been recognized by the United States Court of Appeals for the Sixth Circuit, the improved law enforcement that results from greater minority participation is a sufficiently compelling reason for affirmative action.[14] *Detroit Police Officers' Association v. Young*, 6 Cir.1979, 608 F.2d 671, 695, *cert. denied*, 1981, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951. This interest has been labled the "operational needs" defense. *Id.* It is based upon the findings of law enforcement studies that public cooperation with and support of the police force are enhanced by minority representation that is reflective of the community.[15] Because of the importance of public assist-

ance to effective law enforcement, the government has an interest in a police department in which the blacks have a fair share of policing responsibilities.

Despite the importance of the governmental interests served by affirmative action, the government intervenors in this case assert that a prospective race-conscious plan cannot withstand strict scrutiny because it is not "closely tailored" to the state's interest. They maintain that relief is "closely tailored" only when it is limited to make-whole remedies awarded to *identifiable victims* of prior racial discrimination. I reject this contention. In some circumstances, class-based relief is both required and "closely tailored". By failing to recognize this principle, the government intervenors ignore thirty years of jurisprudence and strike a severe blow to the cause of equal protection.

When the Supreme Court decided *Brown v. Board of Education*, it showed little interest in the individual plaintiffs. If the discrimination the plaintiffs suffered individually had been a primary concern of the Court, the Court would have required instant admission of the children to the schools to which they had applied. Instead, the Court postponed argument on relief to the following Term, because its interests focused on undoing the effects of longstanding discrimination against blacks as an ethnic group, rather than on providing relief to the "identifiable" individuals. The remedy of desegregation "with all deliberate speed" was a clear recognition that in a case involving restructuring of an institution the relief must be group oriented.

Unfortunately, on remand a highly regarded judge took a narrow view of the Supreme Court's decision in *Brown*.

---

14. *See* Kaplan, *Equal Justice in an Unequal World: Equality for the Negro—The Problem of Special Treatment*, 61 Nw.U.L.Rev. 363 (1966). Although Professor Kaplan suggests that the judiciary maintain a hands-off policy with respect to affirmative remedies, he recognizes that in urban police work a black officer may be more effective in his job simply because of his race. *Id.* at 388.

15. *Detroit Police Officers' Ass'n v. Young*, 608 F.2d at 695 (citing National Advisory Comm'n on Criminal Justice Standards and Goals, *Police* (1973); National Comm'n on the Causes and Prevention of Violence, *Final Report: To Establish Justice, To Insure Domestic Tranquility* (1969); Report of the National Advisory Comm'n on Civil Disorders (1968); President's Comm'n on Law Enforcement and Administration of Justice, *Task Force Report: The Police* (1967)).

Judge John Parker seized upon language appealing to die-hard segregationists and to those lawyers and judges schooled on the notion that the only rights created by the fourteenth amendment are rights personal to the individual. *Briggs v. Elliott,* 1955, E.D.S.C. (per curiam), 132 F.Supp. 776:

> "The [equal protection clause] ... does not require integration. It does not forbid such segregation as occurs as the result of voluntary action. It merely forbids the use of governmental power to enforce segregation."

*Id.* at 777. This Court labored to overcome the *Briggs* dictum, which I view as identical in meaning and in effect with the Attorney General's shibboleth in this case: Relief is limited to identifiable victims. This Court finally overcame the *Briggs v. Elliott* thinking in *United States v. Jefferson County Board of Education,* 5 Cir.1966, 372 F.2d 836, 846 n. 5. In *Jefferson,* this Court stated that the Supreme Court's delay in fashioning relief in *Brown* was a recognition that "the 'personal and present' right of the individual plaintiffs must yield to the overriding right of Negroes as a class to a completely integrated public education". *Id.* at 868. We imposed an affirmative duty on the school boards to eradicate the dual educational system "lock, stock, and barrel".[16] Without this relief, some discrimination, such as deterrence of unidentifiable black applicants even before they apply for jobs, would go unremedied. Thus, relief aimed at the group meets the constitutional requirement of "closely tailored" relief when systemic discrimination has been perpetrated against

the group. When the vice is in the system or the institution, the system or institution must be restructured to eliminate the vice.[17]

Nor can it be argued persuasively that such a group right is appropriate only in the area of school desegregation.[18] Education serves little purpose and small motive exists to obtain an education, if blacks are denied the opportunity to use their education through equal employment opportunity. Accordingly, in *Morrow v. Crisler,* 5 Cir. (en banc), 491 F.2d 1053, *cert. denied,* 1974, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139, we ordered the fashioning of an affirmative hiring program for the Mississippi Highway Patrol that would "work[ ] and work[ ] now ... [to eliminate] discriminatory hiring policies ... and [to eradicate] the evils of their existence". *Id.* at 1056. And in the voting rights cases of the 1960s, this Court adopted remedies designed to ensure that all vestiges of discrimination would be removed.[19] In doing so, we had to deal with blacks as blacks, not individually but as a group. This relief was "closely tailored" within the meaning of the constitutional requirement.

No progress can be made in remedying discriminatory practices until, in an appropriate case such as this one before the Court, we fashion relief for the oppressed group and wholly reject the concept of "identifiable victims". Parenthetically, I ask: Who were the "identifiable victims" of segregated drinking fountains or wading pools in public parks? The folly of the government intervenors' position should be evident: If relief had been limited to identifiable victims of discrimination, desegrega-

---

**16.** The Supreme Court described this duty as one requiring the elimination of school discrimination "root and branch". *Green v. County School Bd. of New Kent County,* 1968, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed.2d 716, 723.

**17.** *See* Fiss, *A Theory of Fair Employment Laws,* 38 U.Chi.L.Rev. 235 (1971). Professor Fiss notes that "[i]t is a well-established principle that a decree may hold a defendant who has violated a legal prohibition to a higher standard of conduct than that required by the prohibition itself. The decree should not only prevent discriminatory employment decisions from occurring but also *eradicate the effects of those deci-*

*sions." Id.* at 287 (emphasis added) (footnote omitted).

**18.** *See Armstrong v. Board of School Directors,* 7 Cir.1980, 616 F.2d 305, 317, finding that "it is clear that the rights involved in employment desegregation cases are similar in scope, origin, and significance" to those involved in school desegregation cases.

**19.** *See, e.g., United States v. Mississippi,* 5 Cir. 1964, 339 F.2d 679; *United States v. Duke,* 5 Cir.1964, 332 F.2d 759; *United States v. Lynd,* 5 Cir.1962, 301 F.2d 818, *cert. denied,* 1963, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed. 125.

tion would still be a litigable issue in many areas in which it is now a dead issue. I loathe to see this Court retreat to a position long ago overcome, and I therefore reject any contention that prospective race-conscious steps by government employers is proscribed by either Title VII or the equal protection clause of the fourteenth amendment.

I also reject the proposition, implied in Judge Gee's opinion, that the Constitution does not grant the power to the federal government to provide for remedial action aimed at eliminating the present effects of past discrimination against blacks as a class. Wholly aside from the fourteenth amendment, the thirteenth amendment [20] is an affirmative grant of power to eliminate slavery along with its "badges and incidents" and to establish universal civil freedom. *The Civil Rights Cases*, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. The amendment envisions affirmative action aimed at blacks as a race.[21] When a present discriminatory effect upon blacks as a class can be linked with a discriminatory practice against blacks as a race under the slavery system, the present effect may be eradicated under the auspices of the thirteenth amendment. As the first Justice Harlan pointed out in his dissenting opinion in *The Civil Rights Cases:*

> "That there are burdens and disabilities which constitute badges of slavery and servitude, and that the power to enforce by appropriate legislation the Thirteenth Amendment may be exerted by legislation of a direct and primary character, for the eradication, not simply of the institution, but of its badges and incidents, are propositions which ought

to be deemed indisputable. They lie at the foundation of the Civil Rights Act of 1866.... [My brethren] admit, as I have said, that the Thirteenth Amendment established freedom; that there are burdens and disabilities, the necessary incidents of slavery, which constitute its substance and visible form; that Congress, by the act of 1866, passed in view of the Thirteenth Amendment, before the Fourteenth was adopted, undertook to remove certain burdens and disabilities, the necessary incidents of slavery, and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell, and convey property as is enjoyed by white citizens; that under the Thirteenth Amendment, Congress has to do with slavery and its incidents; and that legislation, so far as necessary or proper to eradicate all forms and incidents of slavery and involuntary servitude, may be direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not."

109 U.S. at 35.

In enacting Title VII, Congress expressly relied upon its power under the commerce clause. The legislation is supportable, however, under the enabling clause of the thirteenth amendment to the same extent that, as the first Justice Harlan said, the Civil Rights Act of 1866 is supported by the thirteenth amendment. At the time of the passage of the Civil Rights Act of 1964, the thirteenth amendment was in a state of

---

**20.** "Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation."

U.S. Const. amend. XIII.

**21.** *See* Howe, *Federalism and Civil Rights,* 77 Proc.Mass.Hist.Soc'y 15 (1966), stating that "Congress is ... vested with the power conferred upon it by the Thirteenth Amend-

ment—the power, that is, to extirpate the vestiges of slavery.... Congress should be permitted to seek the fulfillment of the predominant promise of the three Civil War amendments. That promise was that henceforth the Nation's authority would so be exercised as to subdue law's inhumanity to man.... [I]t takes no stretch of constitutional power to exercise the Nation's authority over acts of racial terror and violence in communities that have rejected the supreme law of the land and encouraged hatred to go at large."

*Id.* at 27.

**1578**

disuse. Not until the Supreme Court's decision in *Jones v. Alfred Mayer Co.*, 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189, was the amendment restored to its rightful place in the constitutional scheme. The constitutionality of action taken by Congress, however, "does not depend on recitals of the power which it undertakes to exercise". *Woods v. Miller*, 1947, 333 U.S. 138, 144, 68 S.Ct. 421, 424, 92 L.Ed. 596, 602; *see also EEOC v. Wyoming*, 1983, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18. Thus, the thirteenth amendment lends constitutional support to affirmative action taken under the auspices of Title VII.[22]

The congressional debates on the thirteenth amendment reveal that both its opponents and its proponents recognized its far-reaching potential. *See generally* Buchanan, *The Quest for Freedom: A Legal History of the Thirteenth Amendment*, 12 Hous.L.Rev. 1 (1974); tenBroek, *Thirteenth Amendment to the Constitution of the United States*, 39 Calif.L.Rev. 171 (1951).[23] The abolition of slavery mandated by the amendment is not confined to the elimination of the "auction block", that is, the institution of legally enforceable servitude. It also extends to the badges and incidents of a slavery system that were imposed upon blacks as a race. The abolition of slavery was intended to leave in its wake universal civil freedom.[24] In granting Congress the power to carry out this mandate, the amendment necessarily grants the power to eliminate practices that continue to burden blacks with badges of inferiority and to hinder the achievement of universal freedom.

The Congress that drafted the thirteenth amendment recognized its broad scope, but early judicial interpretation artificially narrowed its reach. In *The Civil Rights Cases*, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, the Supreme Court held that the thirteenth amendment did not give Congress the authority to enact a law providing that all persons have equal right of access to accommodations in inns, to public conveyance, and to public amusements. Writing for the majority, Justice Bradley reasoned that "[i]t would be running the slavery argument into the ground, to make it apply to every act of discrimination which a person may see fit to make". *Id.* at 24, 3 S.Ct. at 30. Justice Bradley adopted a narrow view of what constituted a badge of slavery, limiting the definition to the legal capacity to enjoy fundamental rights.[25] *Id.* at 24–25, 3 S.Ct. at 30–31.

The first Justice Harlan, in his famous dissent, rejected the restrictive interpretation adopted by the majority. He reasoned that badges of slavery encompassed all practices that continued to label blacks as inferior because of their race. *Id.* at 39–40, 3 S.Ct. at 41–42; *see also Plessy v. Ferguson*, 1896, 163 U.S. 537, 552, 16 S.Ct. 1138, 1143, 41 L.Ed. 256 (Harlan, J., dissenting). Accordingly, the thirteenth amendment's mandate of universal civil freedom necessitated protection of blacks as a class against racial discrimination with regard to their civil rights. 109 U.S. at 36, 3 S.Ct. at 24. The burdens on enjoyment of their newfound rights thus should be classified as badges of slavery.

22. *See* L. Tribe, *American Constitutional Law* § 5–13, at 259 (1978), stating that "Congress is free, within the broad limits of reason, to recognize whatever rights it wishes, define the infringement of those rights as a form of domination and thus an aspect of slavery, and proscribe such infringement as a violation of the thirteenth amendment".

23. For a more complete discussion, see tenBroek, Equal Under Law (Rev. 1st Ed.1965).

24. *See* Howe, *Federalism and Civil Rights*, 77 Proc.Mass.Hist.Soc'y 15, 23 (1966), stating that the thirteenth amendment was "a constitutional outlawry" of slavery that "empowered [Con-

gress] to make the outlawry totally effective". "The Thirteenth Amendment, Harlan pointed out, abolished the 'national right' of slaveholders to hold slaves and substituted a new national right to freedom from the status of an 'inferior race,' a status the Negro had been forced into by the institution of slavery." Kinoy, *The Constitutional Right of Negro Freedom*, 21 Rutgers L.Rev. 387, 408 (1967).

25. These rights included the right to contract to hold property, and to testify in court. Fundamental legal rights were distinguished from social rights. The Civil Rights Cases, 109 U.S. at 22–24.

Although Justice Harlan's interpretation closely reflected the intent of the drafters of the thirteenth amendment, that interpretation went unheeded for 85 years. Eventually it was vindicated by the Supreme Court in *Jones v. Alfred Mayer Co.*, 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189. In *Jones v. Mayer*, the Supreme Court affirmed the power of Congress, based on the thirteenth amendment, to prohibit all racial discrimination in the sale and rental of property. *Id.* at 437–44, 88 S.Ct. at 2202–05. The Court held that "Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and incidents of slavery, and the authority to translate that determination into effective legislation." [26] *Id.* at 440, 88 S.Ct. at 2203. Under the *Jones v. Mayer* rationale, current forms of racial discrimination are badges of slavery that may be proscribed under the thirteenth amendment if they are historically linked with slavery or involuntary servitude.[27]

One of the cornerstones of slavery was the race-based denial of equal economic opportunities, especially in governmental jobs requiring the exercise of authority. Historically, there is a close linkage between the discrimination against blacks in the New Orleans Police Department and the Black Codes and Jim Crowism, which were substituted for slavery. There were, of course, no black law enforcement officers before federal troops occupied New Orleans in the Civil War in 1862. There is testimony in the record that there were no black officers in the Department until 1950. This is historically incorrect. Federal troops occupied New Orleans from 1862 until 1877, and policed it, assisted by a small force of municipal police officers, almost all black. In 1868 Governor Henry Clay Warmouth put through legislation creating the Metropolitan Police for Orleans, Jefferson, and St. Bernard parishes. Using the Republican (mostly black) members of the old city police as a nucleus, Warmouth made it into a military organization that was later expanded into what amounted to a state militia under the governor's control. The Metropolitan Police came to be the military arm of the Radical Republicans from 1869 through 1877. Needless to say, most Louisiana whites bitterly resented the police. On September 14, 1874, a date still celebrated annually by certain citizens of New Orleans, the White League (Knights of the White Camellia/First Crescent City Regiment) fought a pitched battle against the Metropolitan Police at the foot of Canal Street in New Orleans. The White Leaguers, among whom was Edward Douglas White, later Chief Justice of the Supreme Court, routed the police with loss of life on both sides, and although federal troops under General Philip Sheridan later restored order, the Metropolitan Police was no longer effective. Armed White Leaguers patrolled the polling precincts in the election of 1876. After the Hayes-Tilden "deal" in 1877 [28]

---

**26.** "Just as the Black Codes, enacted after the Civil War to restrict the exercise of those rights, were the substitutes for the slave system, so the exclusion of negroes from white communities became a substitute for the Black Codes. And when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery." *Jones v. Alfred Mayer Co.*, 392 U.S. at 441–43, 88 S.Ct. at 2204–05.

**27.** Justice Douglas, concurring in *Jones v. Mayer*, maintained that persisting racial prejudices are themselves relics of slavery. 392 U.S. at 448–49. Similarly, in *Bell v. Maryland*, 1964, 378 U.S. 226, 247–48, 84 S.Ct. 1814, 12 L.Ed.2d 822, Justice Douglas argued that "the Black Codes were a substitute for slavery, that segregation was a substitute for the Black Codes",

and that "discrimination in the sit-in cases [therefore] is a relic of slavery". *See also* Note, *The "New" Thirteenth Amendment: A Preliminary Analysis*, 82 Harv.L.Rev. 1294, 1308–09 (1969); Howe, *Federalism and Civil Rights*, 77 Proc.Mass.Hist.Soc'y 15 (1966).

**28.** In the national election of 1876 Samuel J. Tilden and the Democratic Ticket received a quarter of a million more popular votes than Rutherford B. Hayes received and 184 uncontested electoral votes, or just one short of the number required to elect. Hayes trailed with only 166 uncontested electoral votes. The 19 doubtful votes were from Louisiana, South Carolina, and Florida. Two governments competed for control in both South Carolina and Louisiana. Congress created an Electoral Commission to decide the question. *Justice Joseph P.*

and until Louisiana adopted its Constitution of 1898, there were unquestionably some brave black police officers in New Orleans. After 1898—the deluge. That constitution disenfranchised blacks. There were not only no black voters to speak of; there were no black officeholders. And there were no black policemen. The dynamics of Reconstruction and then "Redemption" of the state had relegated blacks to the bottom of the caste system, especially in terms of serving as police officers in the City of New Orleans.[29] Historically, therefore, the lack of employment opportunity for blacks with the New Orleans police force is closely linked to the former system of slavery and the reaction of whites unwilling after Reconstruction and Redemption to accept any blacks on the police force. The under-representation of blacks on the force since 1898, or perhaps since 1874–77, is a badge of slavery: it is a sign, readily visible in the community, that attaches a stigma upon the black race.

Because the thirteenth amendment seeks to attain "universal civil freedom for blacks as a race",[30] remedial action must address the needs of blacks as a race. Remedies limited to identifiable victims will not carry out the mandate of the amendment to eliminate the "badges and incidents" of slavery. Nor will a prohibition on present practices alone remove the vestiges of slavery; posi-tive, prospective remedial action is required. *See* Note, *The "New" Thirteenth Amendment: A Preliminary Analysis*, 82 Harv.L.Rev. 1294, 1308 (1969). Accordingly, the structure of an organization that not only reflects but necessarily continues the effects of past discrimination must be changed to eliminate the effects of that discrimination. The thirteenth amendment focuses on the rights of a people, in *Dred Scott* declared inferior and incapable of participating as citizens. *Dred Scott v. Sandford*, 1857, 60 U.S. (19 How.) 393, 15 L.Ed. 691. Their right of national citizenship made effective through the first sentence of the fourteenth amendment,[31] and their thirteenth amendment rights to be liberated from the badges of slavery, can be vindicated only through affirmative race-conscious relief.

## II.

I dissent from the Court's conclusion that the district judge did not abuse his discretion in rejecting the proposed consent decree. I also dissent from the approach used to reach that conclusion.

■ I agree with Judge Williams' that our duty is to determine whether the trial judge abused his discretion in rejecting the consent decree. *See, e.g., Cotton v. Hinton*, 5 Cir.1977, 559 F.2d 1326, 1331–32. In making that determination, however, this Court must consider the effect of the proposed consent decree *as a whole*.[32] *Id.*

---

*Bradley, author of the majority opinion in The Civil Rights Cases, cast the deciding vote* in the Commission's eight-to-seven decision to recognize the Republican delegates for Hayes. After a brief delay President Hayes removed federal troops from the statehouses of Louisiana, South Carolina, and Florida, and the last of the Carpetbag regimes collapsed. Subsequent presidential appointments and congressional legislation raise the inference that the compromise extended beyond the removal of federal support of Republican regimes in Louisiana and South Carolina as a *quid pro quo for the blessing* given President Rutherford B. Hayes. C. Vann Woodward, *Origins of the New South* 23–74 (1951). *See generally* C. Vann Woodward, *Reunion and Reaction* (1951).

**29.** For a more detailed discussion of this segment of Louisiana history, see *United States v. Louisiana*, E.D.La.1963, 225 F.Supp. 353, 363–76, *aff'd*, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709, and the authorities there cited. For a recent discussion, see J. Taylor, *Louisiana*

*Reconstructed, 1863–1877*, at 176–82, 503–08 (1974).

**30.** The Civil Rights Cases, 109 U.S. at 20.

**31.** "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S.Const., amend. XIV, § 1.

**32.** Among the factors to be considered are the complexity, expense, and duration of the litigation, the strength of the plaintiff's case on the merits, the reaction of the class to the proposed settlement, the stage of the proceedings at which the decree is proposed, the likelihood of liability and the amount of damages at stake, the ability of the defendants to withstand the probable judgment, and the range of reasonableness for the settlement. *Armstrong v. Board of School Directors*, 7 Cir.1980, 616 F.2d 305; *Lowenschuss v. Benkdorn*, 2 Cir.1980, 613 F.2d 18, *cert.*

*The settlement stands or falls in its entirety. Id.* Neither this Court nor the district court is free to rewrite the agreement reached by the parties by deleting, modifying, or substituting individual provisions of the proposed settlement. *See Officers for Justice v. Civil Service Commission,* 9 Cir.1982, 688 F.2d 615, 630, *cert. denied,* 1983, —— U.S. ——, 103 S.Ct. 1219, 75 L.Ed.2d 456; *Armstrong v. Board of School Directors,* 7 Cir.1980, 616 F.2d 305, 315; *Cotton v. Hinton,* 5 Cir.1977, 559 F.2d 1326, 1331–32.

The district judge rejected the entire decree, and by affirming that judgment, this Court also rejects the decree in its entirety. Thus, the Court is incorrect in saying that "[t]he great bulk of the proposed decree was approved by the court". A consent decree is not a series of severable provisions.[33] If the Court's opinion is upheld, the parties must renegotiate and the case must be retried. Accordingly, the question before this Court is not whether the district court abused its discretion in rejecting the single provision upon which the district court and the majority focus, but whether the court abused its discretion in rejecting the *entire* decree when it found only one provision objectionable. If this Court accepts the district court's conclusion that the one-to-one promotion plan is unreasonable—a proposition I reject for the reasons stated in this opinion—it should ask whether that provision is so objectionable that it outweighs the total gain that would be realized from the proposed consent decree. In formulating an answer to this question, the Court should consider the probable effect of the total rejection of the consent decree. In this case, the first EEOC charge was filed in 1972. This suit was filed in 1973. Eight years later, on the eve

of trial and after a lengthy period of negotiation and compromise, the parties reached a settlement agreement. In 1984, this agreement is in jeopardy. Members of this Court have had to study the case carefully, consuming more time. If the consent decree is rejected, the parties will have to begin anew with settlement negotiations. If the delicate balance reached by the parties and upset by the district court cannot be reconstructed, a trial on the merits will follow, causing additional expense to the litigants and further delay in remedying the unlawful discrimination that almost unquestionably will be found. With all deference to my colleagues, I suggest that if they had considered more carefully the abuse of discretion issue in the context of the entire decree, I am certain that a different result would have been reached.

Even under the narrow focus used by Judge Williams in his opinion for the Court, however, I would find that the district court abused its discretion in rejecting the consent decree. Voluntary settlement is the method preferred by Congress for resolving Title VII suits and eliminating employment discrimination. *Alexander v. Gardner-Denver Co.,* 1974, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147. The public interest is served by voluntary settlements: settlement minimizes the costs to the parties and the strain on scarce judicial resources. *Armstrong v. Board of School Directors,* 7 Cir.1980, 616 F.2d 305, 313 (citing *Cotton v. Hinton,* 559 F.2d at 1331). Remedial decrees drafted by the parties themselves engender community support for the voluntary effort to eliminate discriminatory practices and effects. Such support is beneficial to achieving the objectives of the Act. *Armstrong,* 616 F.2d at 318. The district judge erred in not giving sufficient attention to the policy favoring voluntary settlement of Title VII suits.[34]

*denied,* 1981, 449 U.S. 840, 101 S.Ct. 117, 66 L.Ed.2d 46; *Girsh v. Jepson,* 3 Cir.1975, 521 F.2d 153.

**33.** *See Officers for Justice v. Civil Service Comm'n,* 9 Cir.1982, 688 F.2d 615, *cert. denied,* 1983, 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456, holding that a settlement must stand or fall as a whole. *Id.* at 630.

**34.** Although the public objectives embodied in the Civil Rights Act warrant a careful review of

the provisions of a proposed consent decree, the clear policy in favor of encouraging voluntary settlement should also be taken into account, particularly when voluntary compliance by the parties will be required over an extended period to achieve statutory goals. *Patterson v. Newspaper & Mail Deliverers' Union,* 2 Cir.1975, 514 F.2d 767, 771, *cert. denied,* 1976, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203.

Because of the strong policy in favor of settlement, this Court accords a presumption of validity to proposed consent decrees. *United States v. City of Alexandria,* 5 Cir.1980, 614 F.2d 1358, 1362. This presumption is overcome only on a showing that the decree contains provisions that are unreasonable, illegal, unconstitutional, or against public policy. *Id.* The district judge found that "the proposed consent decree readily passes constitutional muster as fair, adequate and reasonable" to members of the oppressed class. *Williams v. City of New Orleans,* 1982, E.D. La., 543 F.Supp. 662, 665. He found also that, at the time of settlement, the parties were facing a lengthy, hotly contested, and complex trial on the merits. A trial would cost the parties several hundred thousand dollars and would cause delay in fashioning and implementing relief. *Id.* Despite the benefits of the proposed decree, the district court rejected it, finding that the targeted 50 percent minority representation was unsupported by the evidence,[35] that the impact of the one-to-one promotion ratio would be impermissibly harsh on non-blacks, that this impact would be exacerbated by the probable duration of the decree,[36] and that the promotion plan was "unnecessary" to afford relief to the plaintiffs. *Id.* at 684–85. None of these findings justifies the rejection of the proposed consent decree.

First, the district court's rejection of the 50 percent goal constitutes an abuse of discretion. Mathematical certainty is not required in the context of a consent decree; the figure need only be reasonable. I stand on the opinion of the original panel regarding the correctness of the 50 percent goal, and I shall not duplicate the panel's analysis here. *See Williams v. City of New Orleans,* 5 Cir. 1982, 694 F.2d 987. I note, however, that in *City of Alexandria* we held that a goal based on the racial

proportion of the labor force is presumptively reasonable. 614 F.2d at 1336 n. 18; *see also United Steelworkers of America v. Weber,* 1979, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480. The 50 percent goal contained in the proposed consent decree is based on the 1980 census showing that 55 percent of the New Orleans population is black.[37] .

The district judge rejected the use of the population of the City of New Orleans as a data base, maintaining that the population of the Standard Metropolitan Statistical Area (SMSA) should be used. A significantly lower percentage of the suburban area of New Orleans is black. The district court abused its discretion in rejecting the use of the City population figures: The City is clearly an appropriate labor market. A state statute directs that officer-candidates be selected from among the qualified voters of the city. If, "after diligent effort", a sufficient number of candidates cannot be found from this population, the department may then select candidates from other areas. La.Rev.Stat.Ann. § 33:2411 (West Supp.1982). On similar facts, the United States Court of Appeals for the Sixth Circuit held that the city population of Detroit, not the SMSA, was the appropriate population base to be used in formulating an affirmative action plan. *Detroit Police Officers' Association v. Young,* 6 Cir.1979, 608 F.2d 671, 688, *cert. denied,* 1981, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951. The police force in New Orleans also serves only the City's population. In these circumstances, the City population is a proper basis for formulating a decree.

Even if I were to agree that the SMSA is one appropriate comparison, I would find it an abuse of discretion for the district judge to reject other appropriate labor markets.

---

**35.** The court did not, however, suggest an alternative figure.

**36.** The plan would be in effect until a racial balance was achieved; the required period has been estimated to be twelve years.

**37.** More than 67 percent of the applicants to the police department in 1980 were black; a part of

this percentage is accounted for by an intensified effort to recruit blacks. The record, however, cannot reflect the number of blacks who were deterred from applying to the Department because of its known discriminatory policies. *See supra* note 2.

*See id.* at 688. The court's role in evaluating a consent decree is limited to determining whether the terms are reasonable, fair, and lawful. Certainly, the parties' choice of the City as a labor market is fair, and not unlawful. The district court is not free to impose its perspective on the parties, but should accept their decision if it is within a "range of reasonableness". *Stotts v. Memphis Fire Department,* 6 Cir.1982, 679 F.2d 541, 559, *cert. granted,* June 6, 1983, 51 U.S.L.W. 3871. In this case, the district judge improperly imposed his perspective on the parties, and by doing so abused his discretion.

Second, the district court erred in holding that the one-to-one promotion ratio would have an impermissibly harsh effect on women, Hispanics, and non-minorities. Under the standards enunciated in *United Steelworkers of America v. Weber,* 1979, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480, the proposed one-to-one ratio is permissible. This consent decree, like the voluntary plan in *Weber,* is aimed at breaking down patterns of segregation and opening opportunities for blacks in traditionally segregated fields. *Id.* at 208, 99 S.Ct. at 2730. A "sharing of the burden" of remedying past discrimination by other employees is not impermissible. *Franks v. Bowman Transportation Co.,* 1976, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444. Some burden is acceptable. *See Moore v. City of San Jose,* 9 Cir.1980, 615 F.2d 1265, 1272, stating that the district court should consider the effect of the settlement on incumbent employees, but that some harm is justified to achieve the goals of Title VII. The proposed consent decree does not "unnecessarily trammel"[38] the interests of non-black employees. It neither calls for the discharge of any worker nor creates an absolute bar to advancement of non-blacks. *Weber,* 443 U.S. at 208, 99 S.Ct. at 2729; *see also International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, in which the Supreme Court implicitly approved a consent decree requiring that the company hire one black or Spanish-surnamed person for every white hired, until the percentage of minorities employed by the company reflected the percentage of minorities in the metropolitan area.

This Court adopts the district court's finding that the proposed consent decree would adversely affect women. This position is difficult to understand and certainly untenable: black women would be aided by the decree because they, like black men, would be included in the one-to-one promotion plan. Non-black women are in the same position as non-black men, and thus would not be burdened "impermissibly".

The Hispanic officers contend that the decree will have an impermissibly harsh impact on them. At this time, however, they are adequately represented. As pointed out in the panel opinion, white Hispanics constitute 3.4 percent of the population of New Orleans. In the supervisory rank, Hispanics constitute 3.5 percent of the sergeants, 3 percent of lieutenants, 12.7 percent of captains, and 16.78 percent of the majors in the department.

Because the one-to-one promotion plan contained in the proposed consent decree complies with the standards provided in *Weber,* I must conclude that the district court abused its discretion in rejecting the decree on the basis of that aspect of the decree.

In his opinion for the Court, Judge Williams attempts to escape the inevitable conclusion that this provision is fair and reasonable by stating that the issue is the "extent of preferential treatment" that is appropriate, and not whether preferential treatment per se is reasonable. In so doing, however, the Court ignores the cardinal principle of district court review of consent decrees: The district court is not free to substitute its judgment for that of the parties. The provision was lawful under *Weber* and other cases. By definition, therefore, it could not unreasonably "trammel the interests" of other employees, and should have been accepted. Nor was the question one of extent, as Judge Williams

---

**38.** *Weber,* 443 U.S. at 208.

implies. The district court totally rejected *any* preferential promotion plan for existing positions. It did not find that another ratio would be more appropriate, but rejected out-of-hand any consent decree containing a preferential plan for existing positions.[39]

Third, the district court found that the alleged impact on non-minority officers would be increased by the probable length of time that the one-to-one promotion plan would be in effect before the percentage of blacks in the supervisory ranks reached the 50 percent goal. This period was conservatively estimated at twelve years, not necessarily long in view of the complete elimination of blacks in the department after 1898 and until 1950. A twelve-year plan is still a temporary one, as is required by *Weber*. *In considering the reasonableness of this provision, it should be compared with the probable remedy that would be ordered after a trial on the merits.* *Stotts*, 679 F.2d at 552–53; *Armstrong*, 616 F.2d at 312. If, after a trial, a district court found that the police department had unlawfully discriminated against blacks, it could order a rightful place remedy. Under such a remedy, *all* promotions would go to the victims of discrimination for a period of years, undeterminable from this record. Viewed in this light, a one-to-one promotion plan for a period of twelve years has a less harsh impact on non-minority employees

than does a total bar on advancement for a period of fewer years. The district court did not properly weigh the settlement against the probable result of litigation on the merits, and therefore reached an incorrect result.

The district judge's final objection—that the one-to-one promotion plan was not "necessary" to afford complete relief to the plaintiffs, 543 F.Supp. at 685—can be disposed of briefly. In so holding, the district judge exceeded the scope of his discretion by impermissibly substituting his judgment for that of the parties. The parties agreed on the plan. They considered this provision "necessary" to their agreement. It should not be rejected, absent a finding of unlawfulness or adverseness to public policy.

Because the district court abused its discretion in rejecting the proposed consent decree, the judgment of the district court should be vacated and the case remanded with instructions to institute the consent decree.

---

**39.** The district judge did not find that the provision creating new supervisory positions was unreasonable.